Good morning, Your Honor. Judge Thayer, Judge Prejeson, and Judge Mahan, I'd like to reserve one minute for rebuttal. We have to keep track of your time. Yes, Your Honor. Okay. Before proceeding with my oral argument, I would like to emphasize, notwithstanding the arguments made by the judge and also the government trial attorney, that the facts, evidence, and oral testimony by the appellant clearly support her claim for asylum based on her forced abortion two times and forced birth control insertion of the intrauterine device twice. This court must consider and find that the immigration judge and the Board of Immigration Appeals abused their discretion in this proceeding by not having afforded the appellant her rights under the U.S. Constitution and relevant Ninth Circuit case laws. Counsel, doesn't it all boil down to whether the application which was written in English and signed by your client in English letters should not have been admitted because there was insufficient evidence that she read English and she understood what she was saying? Well, there's more to it than that, Your Honor. All she had before her was the last page of the application. Right. Yeah. In other words, if there's an adverse credibility finding based on any substantial evidence under the REAL ID Act, you lose. Right. If the adverse credibility finding should not have been made, you win. That's correct, Your Honor. So address that issue. You've got to go right to the heart of it. Okay. Yes, Your Honor. As the court is well aware through the briefs, the client was in detention in the Puerto Rican Detention Center for Immigration. The only contact she had with her attorney, who was hired by her relatives, was through two telephone 15-minute contacts with the paralegal interpreter for the attorney. She never met the interpreter at all in person. She never met the attorney at all in person. She was also aware that the attorney and the interpreter were also in contact with four other women who had come on the same ship with the appellant, and that they were also representing these four women in asylum applications. In her discussions with the interpreter, the interpreter at the second telephone call told her, you will be receiving a document in the mail. It will be one page in English, which will require your signature. When you receive it, sign it and send it back. She also received a document one page in Chinese, which she read and she testified that she had not written, and that was not her signature, and that it contained facts not relevant to her. Based on this, all this information unknown to her was then included in an I-589 application for asylum. She spoke Cantonese. Well, she spoke Chinese, yes, Your Honor. Cantonese. Yeah, Cantonese. Yeah. And the other guys spoke Mandarin. So how did she understand it? Well, you can understand certain words, but, you know, you can put it together. They're almost a completely different language, but they're a dialect of Chinese. So she didn't understand them. She understood enough that you could communicate, and I would think that the interpreter could speak some Cantonese. I'm just surmising that's how it came about. But from what I understand, the native language of the interpreter was Mandarin, which is the basic language, and hers was Cantonese, and both of them probably spoke a little bit of each of the other languages, Your Honor. If I may continue. So at the point where the I-589 was filed, it was not until the individual court hearing, at which point the appellant had provided testimony about her original filing with us. Yes. Why don't you zero in on the adverse credibility finding? The asylum application tells a different story than what she tells at the hearing. In her asylum application, she says she was kicked down a flight of stairs, and that resulted in the death of her fetus. In her testimony, she testifies that she had a forced abortion. That's two different stories. That is sufficient for an IJ to make an adverse credibility finding, because even under the old rules before the Real ID Act, it goes to the heart of the matter. Okay. Now, the issue is, should the asylum application come in at all, because she doesn't read English, was the IJ bound to believe her when she said, I don't read English? Is it stipulated she doesn't read English? Is that a fact which we have to take as established? Well, the IJ at that point in time would have had information about her history, when she came to the United States, how she came to the United States, by a ship that was dropping her off outside Puerto Rico, and her status in China. Could you please concentrate on the scope of discretion of the IJ in making a credibility finding? The discretionary violation that we see of the IJ is that he failed to consider her testimony at all in relationship to the first asylum application. How so? In the fact that when she testified, as I put in my rebuttal, my brief, to the questions that the IJ had questioned her, she came back and answered honestly that that was what I had said in the first application. You know, I never said anything to be put in the first application that was like that. What I said is what I'm testifying is as I have done, and it's in her transcript that she said, I never said that. This is what my testimony is. It is true as of now and in the second application. Did the IJ have the discretion to disbelieve her? Was there any substantial evidence in the record upon which the IJ could make his finding that he didn't believe her? Well, there were two documents, Your Honor. One that stated that she had a forced abortion in China. It was a Chinese documentary evidence showing that she did have the forced abortion and won the forced placement of the intrauterine device. With her testimony and the consistency that she provided to the 589 that we submitted, she never veered from that in her testimony, even when questioned by the trial attorney and the judge. Was there any indication at all at the hearing that she indeed did speak English? No, Your Honor. There was no indication that she spoke English. That's why we needed an interpreter, and that's why she had one, Your Honor. There was an interpreter at the hearing. That is correct, Your Honor, in person. In person. All right. You want to save some time? Let's hear what the government has to say. Well, Your Honor, if that's the crux of the whole matter, that would be the argument that the judge abused his discretion by not finding that she did not speak English at all, that the interpreter that she spoke to did not communicate to her what was in English, and because of that, the judge abused his discretion and her process of interpretation. Her testimony was that this application was sent to her while she was in detention, and the paralegal who spoke Mandarin was able to communicate with her on the phone and tell her to just sign it and send it back. Not quite correct, Your Honor. The application was not sent to her, just the signature page of the application. Just the signature page. Just the signature page. Yes. All right. Now, and then on the page that the Chinese version that was attached to that application, what did she say about her signature on that? Well, she looked at it, and she told the judge, this is not my handwriting, this is not my signature on the pages. Oh, no, no. Here's the question. Judge to Ms. Vang, is that your signature on that line? Yeah, it's my signature. So you did sign it. Oh, are we talking about the Chinese one or about the – Chinese one. The Chinese is different, Your Honor. Oh, okay. On the Chinese one, she told the judge, that is not my composition, that is not my handwriting, I did not write that. Okay. Yeah. Yeah, she said, not my writing. Right. Thank you, Your Honor. Okay. All right. May it please the Court, my name is Yanal Yusuf, I represent the Attorney General of the United States. And just to go to the two points that were discussed during the petitioner's statements, and regarding to the immigration judge's discretion, the Real ID Act, which governs this case based on the fact that it was instituted after the May 11th enactment of Real ID, is that the immigration judge may consider, aside from the demeanor and the responsiveness of the applicant, he can also consider written statements, whether they're made under oath or not, as in this case. The IJ made no finding of adverse credibility based on demeanor. Excuse me? He made no finding of adverse credibility based on demeanor. Oh, that's correct, Your Honor. So the only substantial evidence upon which an adverse credibility finding could be made was the inconsistency between her application, I got kicked down the stairs and lost my fetus. That's version one. Version two, as she testified, I had a forced abortion. Clear contradiction. The only issue is should the first version have been admitted in evidence because she said she didn't read English and it was printed in English and she said she didn't say those facts to the person who put them in the application. Now, why was the IJ within his discretion in making a finding that she was lying as to whether she spoke English or whether she put those facts to the person who prepared the application? Because in this instance, Your Honor, the petitioner did in fact sign the document which creates a presumption that she was aware of the contents. The presumption only applies if there's some evidence from which one can deduce that she speaks English. I mean, if I sign a document in Russian, you can't presume I know what it says. You can presume I'm stupid for having done it, but you can't say that I knew what the document said. That's correct, Your Honor, but in this instance, the petitioner presents no evidence that the interpreter that she spoke with on the phone was incorrect. But what's the foundation for the admission of that first application? Yeah, that's important. What's the foundation for that? Well, in one instance, the immigration judge under the Real ID can consider statements. No, he can't, but I mean, as Judge Baez says, here's a statement that maybe came from her or maybe didn't, and there's serious questions about whether it came from her. And by that, I mean whether she originated it or whether it's the result of a mistranslation or this Mandarin interpreter talking to four other women and maybe getting her story confused with somebody else. I guess to that... To use this to attack her credibility, it's got to be solid. There's a solid foundation here. We know that she signed this. We know she understood it. We know that she is speaking, in effect, through this first document, and you can't tell that from the record. I mean, it appears it's just full of holes. I mean, she doesn't speak English, correct? I mean, there's no evidence that she does speak English, right? And this attorney from Puerto Rico, was that attorney representing her? She never met the attorney. Her only contact with the attorney was through a Mandarin interpreter, and she speaks Cantonese. As to that document... But you agree that she doesn't speak English. Yes, Your Honor. And she doesn't read English. Agree to that? Yes, that's correct, Your Honor. So what's the foundation for admitting that first application? Well, aside from her signature, and to the point that it's unclear exactly what the scope of the representation was when she was... I understand, but I mean, so she signed a document, but did she understand it?  And the evidence is that she just got a signature page. Here, you just sign that. You just sign that and send it back, and we'll take care of the rest of it. Well, specifically to that, to the asylum application, while there is that language there, there is an indication between her... that asylum application produced by that former attorney from Puerto Rico and her current asylum application, which is the basis of her current claim, the biographical data was nearly identical in both instances, so there was a clear communication between the two in terms of her claim. And further to the claims of cross-contamination with other clients of that attorney, there is no basis for that aside from the assertions within the petitioner's briefs. It's unclear if there was any such cross-contamination with the claims of fabrication that she... But that application that was apparently prepared in the office of the attorney that she never met and the paralegal that she never met, spoke to on the phone for two 15-minute sessions and was able to understand his Mandarin enough to sign a signature page. Now that was first, as I understand it, sent to the immigration people in Puerto Rico. And they rejected it. And then it was sent to Tacoma or Seattle, right? Yes, Your Honor. And they rejected it. They didn't file it, but they kept it. So why didn't they in Tacoma or Seattle, why didn't they accept that application? I believe it's because there was no notice to appear on file at the time. Notice to appear. There was no record that Rushford was this petitioner's attorney on the record, right? I believe that's correct, Your Honor. Yeah. So then how do you get that application then into evidence? It's... It's only used to impeach her, right? Correct, Your Honor. And all of the impeachment arose out of what was stated in English on that never-filed application by a person who is not the attorney of record, right? Yes, Your Honor. But there is a clear... You indicated that regardless whether she understood or not English, there was data in that English application, which was accurate as to her biography and her... Could you tell me what that was? Oh, sure, Your Honor. Just one moment to find it. So in other words, there was some information that was accurate. She claims that some information was inaccurate, but if the I.J. could find that some of that information was accurate, maybe he could, based on that, have believed that she prepared that first application. Is that your point? Yes, Your Honor. There was a proper communication between her and that Mandarin interpreter, the assistant of the former attorney in Puerto Rico. That demonstrates that there was a clear understanding of what was being conveyed between the petitioner as well as that attorney. Excuse me, that Mandarin-speaking assistant. And what were those particular points which were accurate in the English application? Largely, it stems from biographical data. On the first few pages of the asylum application, for example, I believe, in the certified records, page 323 is the application which this current case is based on, and then the first application prepared by the former attorney in Puerto Rico is on page 182 of the record. The first application in English is at ER 182 or is it at ER 323? The application produced by the former counsel in Puerto Rico is on 182. Okay. And the relation is on page 190, right? No. Excuse me, Your Honor. The other document, the second asylum application, which is the case that's based on 323. All right. So your point is that if there were accurate statements in the English translation or in the English document, that would indicate that she did give that information through the Mandarin translator in Puerto Rico and that that was her statement which was inconsistent with her testimony later as to whether she lost the baby falling down the stairs or whether they had a forced abortion. If she lost the baby down the stairs, perhaps she wouldn't have a claim for asylum. If she was forced to abort, she would. Yes. Yes, Your Honor. Okay. I got you. But her testimony was that all she got from the paralegal was a signature page. Isn't that right? Yes, Your Honor. And she signed that and sent it back. Now that's not an uncommon procedure in these so-called immigration law offices. No, I don't believe it is, Your Honor. You don't believe it is what? That there might be an instance where an attorney is unable to reach their client and they're forced to do a telephonic and through correspondence through mail. No, where they just say sign it. Yes. Send it back. Just sign your name here. We'll fill it out later. How long have you been doing this?  How long have you been doing this? Less than a year. Yeah. Well, that's not an uncommon practice. You know, the immigration practice is riddled with crooked lawyers. They don't tell you that in Washington. President Counsel excluded. Of course, Your Honor. I don't mean to go there. Okay. Now, let me. But her testimony was that this English translation that was never presented to her, just the signature page, right? Yes, Your Honor. That's what she testified to. And then she has said that her signature, ER-195, on the Chinese version is not her signature. Yes, Your Honor. Your time's up. Okay. And the immigration judge did state that had it not been for her lack of credibility that she would have been granted asylum. He said that, didn't he? Yes, I believe he did, Your Honor. Yeah. And he said, testimony were credible, she would have established past persecution, and therefore would be granted asylum. Have you seen the English version of statements of these other three women? I have not, Your Honor. But based on the record, that here it's clear, as we've been discussing, that that asylum application, the immigration judge, the agency, was quite reasonable in finding these inconsistencies, and that the claim was incredible, and therefore the petition brought to me a burden. That's if you believe that she understood this statement, and it was read to her and translated, and she agreed to it. And it was pointed out that somehow this paralegal might have moved around, you know, just taking these notes. She speaks Cantonese, he speaks Mandarin. They're two different languages. I understand that, Your Honor. Maybe he picks up fragments on each, but do we know who prepared this application that was never filed? I believe it was the former counsel, Ms. Rushford, and her assistant. But to go to that specifically, that whether there was a faulty translation or a miscommunication or cross-contamination with the other potential applicants, that's on the record based on, as the board found, petitioner's ineffective assistance of counsel claim. They failed to make that claim that there was ineffective assistance of counsel. But we're not talking about ineffective assistance of counsel. We're just talking about the first of all, they never met. As far as the immigration authorities are concerned, she was not the attorney for this petitioner. That's why they never filed the application. And by the time that came in, I believe she had another attorney, the gentleman who's here today. Yes, Your Honor, but there is also a demonstration that there was intent to file that application except for the, because the petitioner was transferred from a detention facility from Puerto Rico to the Seattle-Tacoma area, she was. Whether she intended to file it or not is not important. The question is, is it an inconsistent statement upon which her credibility can be impeached? And you've gone over your time. Yes, I have. I would like to ask a couple of questions of Mr. Huang on rebuttal. Thank you, Your Honor. Mr. Huang, the point made by counsel was that if there are important and individualized facts recited in the English application for asylum that are accurate, that can be a circumstance which can lead the IJ to believe that she understood everything that was in that, and that she did give that statement. For instance, is it true she was married on July 11, 1988? Is that correct? Oh, you mean when she was married? Yes, that's correct. So that's her. Is it true that her first son was born December 27, 1988? I'm reading from the statement. Right. Is it true that she married Ron Jian Feng? That's correct. She was working in a clothing company as an accountant. That's correct. And her husband was a manager at another clothing company. That's correct. So if all those things are correct, why is the rest of the story regarding how she lost her child incorrect? Well, Your Honor, there's two ways of looking at it. One, there's also the immigration interview that ICE conducts after they catch and detain the people. And they issue, subsequent from that, an I-213, I believe, which is the interview. And in there they list questions, as the Court is asking right now. What is your name? When were you born? How many children do you have? Do you have a spouse? Those things are listed on there. Secondly, on the NTA, the number of children. The person who typed this up took the information, the 213, rather than from her? Well, it could have been both ways. I'm not sure, Your Honor. The second way that I'm expressing to the Court is, in certain matters, when you have a communication problem between people who speak different dialects or different languages, they have a way of asking in the Chinese character which character are we talking about, and they can get more specific to the point. The biographic information that we're talking about is specific to her. There's no doubt about it. But to get to the point of the substantive issues would be more difficult, and the Court can see they're inconsistent with each other. So the bioinformation can be obtained either from immigration, from either the NTA, the 213. You're speculating. Here we have a translator who certifies that he's fluent in English and Chinese, and this is a true translation of the original attached. And as counsel points out, if there is evidence that there was accurate information in the English translation, the biographical information which I've just gone over with you, that would be circumstantial evidence that she said that it was accurate, and she said the rest of it also. Well, not the whole story. Coming into the English translation, it doesn't mean that everything that's in the English translation is true and from her. That's our contention. You have to get to the heart of it. Where's the evidence that anything that was in the English translation came from somebody else but her? Well, that was part of my argument I was going to make at the cross-contamination, that the government had almost a year to check with the other applications to see if there were phrases, sentences, words, clauses that were exactly alike or similar. And the court has to consider that the 213 and the NTA do provide that information. Are you saying that the other women also said I was kicked from the second floor through the stairs and when they took me to the hospital, the diagnostics said that I had three left back bones broken and my baby was killed? Did anybody else say that? No. We don't know, Your Honor. That might have been taken from somebody else's report. Yes. And it might have been read from the sports section of yesterday's paper. But, I mean, that's speculation. Well, but our client testified under oath that she'd never said that. One has to believe her, that she's credible. Here you have an inconsistent statement. No, it's inconsistent facts, Your Honor, is what you're saying. The facts of the bio that you're talking about are consistent, and that can be obtained in several different venues. It can be, but where is the evidence that it was? My question is, is there any evidence that the biographical material, which you admit is accurate, came from anybody but her? Your Honor, as we had objected at the hearing, that information was presented after the hearing had started and the information was provided at that time. We had no access to the information prior to that time. I don't understand your answer. Well, the information you're speaking about, the English version, was presented at court after our client had begun her testimony at the individual hearing. We had no... No, no, no. The application has correct biographical information, which leads me to believe that it was given by her and accurately transcribed in the English translation. If that is accurate, the first four lines is accurate, why is not the rest of it accurate as to what she said? I'm trying to explain, Your Honor. Biographic information is much easier to interpret and translate than substantive information. You can ask these questions and it's easier to obtain what is your name, where were you born, are you married, do you have children, versus were you kicked down the stairs and four ribs were broken and things of that nature where our client specifically said that's not what she said. She said she had been forced to undergo an abortion twice, inter-uterine insertion twice. Why would a translator understand the biographical data and misunderstand something so clashingly different as being kicked down the stairs or having a forced abortion in a hospital? Well, Your Honor, as we said, two 15-minute telephone conversations, talking to five women who came from the same ship and never having... If he had been to speak to the other women at the detention center, it would have been reasonable that he would have spoken with her at the detention center also. To my mind... Is there something peculiar about Chinese that says that the words used to describe kicking a person down the stairs are similar to the words that abortion was forced on me? I don't speak Chinese, Your Honor, but what I'm saying is this, that you ask how it could be, and I'm just saying, through cross-contamination of the interviews of the five women... But you don't have any information... No. ...are two different languages. That's correct, Your Honor. Yes. They're two different languages entirely, but some of the words, I suppose the simple words, people can understand. Right, Your Honor. Wasn't her testimony here that this English version was never read to her? That's correct, Your Honor, yes. Is that right? That's correct. And that all she signed was the... Signature page. The application in blank, and she did concede or agree that the signature on the application, that's at page, I believe, 189, is her signature, the signature in Chinese. No, the signature on the application page of the 589 that's in English is hers, yes. Yes, that's at page 189. Okay. Okay, that's hers. Right. And she wrote her name in English as well. I couldn't tell you if she had asked somebody to help her with it or how to do it. Okay, but just let's stick to the Chinese signature. On the application, that's hers, but on the Chinese version, she says it isn't. Correct, Your Honor. All right. Now, have you had those two signatures compared to determine whether or not they're written by the same hand? No, Your Honor, we haven't. We believe the burden of proof is under government to prove. They look different, as you can see, Your Honor. They look different. Do you read Chinese? A little bit, but I can tell characters because they have Korean characters that use the same thing. Oh, I see, okay. And Japanese. Okay. All right. Let me ask the attorney for the government. Has the government compared the signature on page 189, which she says is hers in Chinese characters, with the signature on 195, which the petitioner said is not hers? No, I don't believe we have, Your Honor. Do you have those two before you? Yes, I believe you said 189 and 195. Yeah. Yes, I do. I have them before me, Your Honor. Those two signatures in Chinese, as far as you know, the government has never compared. Yeah, I don't believe they have, Your Honor. All right. Thank you. Thank you. All right, the matter is submitted.
judges: Pregerson, Bea, Mahan